SPENCER *v.* FLINT MEMORIAL PARK ASSOCIATION.

1. JUDGMENT—RES JUDICATA—OWNERSHIP OF CEMETERY LOT—LIMITED BURIAL RIGHTS.

Determination in prior case between plaintiff, a Negro, and defendant nonprofit cemetery association, that plaintiff was the owner of a tax-exempt lot in defendant's cemetery in which burial rights were limited to the dead bodies of members of the Caucasian race only, or of the ashes thereof, became final as to ownership, where no appeal was taken (PA 1869, No 54, as amended).

2. CEMETERIES—BURIAL RIGHTS—RESTRICTIONS.

A cemetery lot owner's rights, aside from valid public regulation, are contractual and subject to ordinary rules of contract law.

3. CONTRACTS—RESTRICTIVE AGREEMENTS—COURTS—STATE ACTION—EQUAL PROTECTION.

Judicial enforcement of contracts containing restrictive agreements directed against persons not of a particular race is State action prohibited by the equal protection clause of the United States Constitution (US Const, Am 14).

4. SAME — RESTRICTIVE AGREEMENTS — DEFENSE — STATE ACTION — EQUAL PROTECTION.

There is no significant difference between the use of a restrictive agreement directed against persons not of Caucasian race as a basis of an action for damages or an injunction and its use as a defense in an action, either use in a court being State action in violation of the equal protection clause of the United States Constitution (US Const, Am 14).

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 30A Am Jur, Judgments § 324 *et seq.*
[2, 10] 14 Am Jur 2d, Cemeteries § 32.
[3–6, 8] 20 Am Jur 2d, Covenants, Conditions and Restrictions § 184.
[7] 20 Am Jur 2d, Covenants, Conditions and Restrictions § 16 *et seq.*
[9] 14 Am Jur 2d, Cemeteries § 31.
[11] 16 Am Jur 2d, Constitutional Law § 485 *et seq.*

5. COVENANTS—CEMETERIES—EQUAL PROTECTION—STATE ACTION.
   Covenants or conditions restricting use and occupancy of lots
   in a tax-exempt cemetery lot to members of a particular race
   are not violative of any rights guaranteed by the equal
   protection clause of the Constitution of the United States but
   State action to enforce them is barred by the equal protection
   clause (US Const, Am 14).

6. STATES—ACTION.
   A State acts by its legislative, executive, or its judicial author-
   ities, and can act in no other way.

7. COVENANTS—ENFORCEMENT.
   Enforcement of a covenant is achieved as much by denial of a
   legal right to which he would otherwise be entitled except
   for the covenant as it would be to expressly command by
   judicial order that the terms of the covenant be carried out.

8. CEMETERIES—BURIAL RIGHT—RESTRICTIVE AGREEMENT—INJUNC-
   TION.
   Covenant restricting burials in a tax-exempt cemetery lot to the
   bodies of persons of the Caucasian race, *held,* not a defense in
   an action for injunction by one who desires to make a burial
   which would violate the covenant to prevent interference by
   officers of cemetery association with such burial (PA 1869,
   No 54, as amended).

9. SAME—RIGHT TO BURIAL—INTEREST IN REAL ESTATE.
   The right of burial in a cemetery lot is an interest in real estate
   which the law recognizes and protects.

10. SAME—RELIGIOUS AND FRATERNAL RESTRICTIONS—VALIDITY.
   A holding that racial restrictions on the use of cemetery lots are
   unenforceable does not require a similar holding that restric-
   tions requiring religious or fraternal membership for burial in
   cemeteries maintained by particular religious or fraternal
   groups are also unenforceable.

11. CONSTITUTIONAL LAW—EQUAL PROTECTION OF LAWS—INDIVIDUAL
   RIGHTS.
   The right to equal protection of the laws is personal to indi-
   viduals, and is not a right of groups only, so that the law
   does not recognize a social, economic, racial, religious, or
   political caste system with a different set of rights and
   desires for all members of each group (US Const, Am 14).

Appeal from Genesee; Newblatt (Stewart A.), J. Submitted Division 2 April 6, 1966, at Lansing. (Docket No. 318.)   Decided September 13, 1966. Leave to appeal denied by Supreme Court November 25, 1966.   See 378 Mich 742.

Bill of complaint by J. Merrill Spencer against Flint Memorial Park Association for injunction. Judgment for plaintiff. Defendant appeals.   Affirmed.

*A. Glenn Epps,* for plaintiff.

*Weiss & Damm (John T. Damm,* of counsel), for defendant.

LESINSKI, C. J.   Plaintiff is the owner of certain burial rights or right of sepulture in lot 21 of section 1 of the Flint Memorial Park Cemetery which is owned by defendant Flint Memorial Park Association, a Michigan nonprofit corporation.

This suit was brought against the association by plaintiff, a Negro, to enjoin the association from interfering with and refusing to allow plaintiff to bury the body of a Negro tendered by plaintiff for burial in the plot owned by plaintiff.   Defendant raised as a defense a restrictive agreement or condition, existing at the time plaintiff purchased the burial plot, which excluded the bodies of Negroes from burial in the cemetery.

The cause being submitted on an agreed statement of facts, the trial court issued a summary judgment in plaintiff's favor from which defendant has processed this appeal.

The sole question to be determined here is: Whether it is a denial of equal protection under the 14th Amendment to the United States Constitution for a State to enforce a restrictive agreement of a cemetery association which would deny the

owner of a cemetery plot, who is a Negro, the right to bury a non-Caucasian therein.

The excellent opinion filed in this cause by the learned trial judge, Stewart A. Newblatt, leaves nothing further to be said. We enthusiastically adopt the reasoning and conclusions therein. The opinion is as follows:

"This court is now being asked to pass on the question of whether a cemetery association may refuse to permit an owner of a lot the right to bury a Negro in that lot. In a sense, it seems highly grotesque to spend such time and legal effort in considering the rights of dead soulless bodies when we have not as a society yet secured full rights for the living.

"This cause has been submitted upon a joint statement of facts which need not be repeated herein except to note that the plaintiff is the owner of a cemetery plot—right of sepulture in the language of the trade—in defendant cemetery which cemetery was organized as a nonprofit corporation under PA 1869, No 12,[1] as a rural cemetery. The plaintiff's ownership of this plot was previously determined in an earlier case between these parties in this circuit, being Case No. 68906, which determination was not appealed and which therefore is final. When a burial right is purchased, one of the conditions thereof provides that:

" 'In no instance shall the cemetery be utilized for the burial of dead bodies of other than the human race and of the Caucasian race only, or of the ashes thereof.'

"It is of no importance to the decision in this cause whether or not such restriction was in the certificate of ownership upon which the plaintiff relies for the plaintiff purchased this lot knowing of

---

[1] See, as last amended, CL 1948 and CLS 1961, § 456.101 et seq., as last amended by PA 1964, No 54 (Stat Ann 1963 Rev and Stat Ann 1965 Cum Supp § 21.871 et seq.).

such restriction. There is no question but that if this court is required to enforce this provision, it would be applicable to the plaintiff and his burial plot.

"The statute under which the defendant was organized provides that lands set aside for cemetery purposes and the rights of burial therein are wholly tax exempt, CL 1948, § 456.108 (Stat Ann 1963 Rev § 21.878), and that such rights are transferable and as fully alienable as any other personal property in this State subject only to such conditions as shall be prescribed by the board of directors (CLS 1961, § 456.112 [Stat Ann 1963 Rev § 21.882]).

"The owner of the lot, the plaintiff, is a Negro and the body tendered and which was refused was that of a Negro. It is in this general context that this cause must be decided.

"Obviously under the law of contracts, we must deny the plaintiff recovery if the restriction is enforceable for aside from valid public regulation, a cemetery lot owner's rights are contractual and subject to the ordinary rules of contract law. 4 Michigan Law and Practice, p 674; 14 CJS, Cemeteries, § 25; *Lewis* v. *Glen Eden Development Company* (1936), 276 Mich 627. This brings us squarely to the 1948 case of *Shelley* v. *Kraemer* and *McGhee* v. *Sipes* (1948), 334 US 1 (68 S Ct 836, 92 L ed 1161). (Note that although the case is known as *Shelley* v. *Kraemer, McGhee* v. *Sipes* was a companion case which came to the United States Supreme Court by certiorari from the Michigan Supreme Court.) In Michigan prior to this case, the Michigan Supreme Court considered that covenants prohibiting sale or transfer of title to persons of a particular race were invalid as constituting unlawful restraints on alienation, 3 ALR2d 475; but Michigan also took the view that racial covenants or conditions restricting *use* and *occupancy* by non-Caucasians were generally valid and enforceable. *Parmalee* v. *Morris* (1922), 218 Mich 625 (38 ALR 1180); *Schulte* v. *Starks* (1927), 238 Mich 102; *Sipes* v. *McGhee* (1947), 316 Mich 614, rev'd 334 US 1 (68 S Ct 836, 92 L ed

1161); *Northwest Civic Association* v. *Sheldon*
(1947), 317 Mich 416 (4 ALR2d 1359); *Malicke* v.
*Milan* (1948), 320 Mich 65 (4 ALR2d 1412), (re-
versed after *Shelley* v. *Kraemer*); *Porter* v. *Barrett*
(1925), 233 Mich 373 (92 ALR 1267). As a result
of *Shelley* v. *Kraemer* which reversed *McGhee* v.
*Sipes,* the judicial enforcement by State courts of
covenants restricting the use and occupancy of real
property to persons of the Caucasian race was held
to be in violation of the 'equal protection' clause of
the 14th Amendment to the United States Constitu-
tion. The reasoning of this decision makes it clear
that although that amendment prohibits *State action*
which denies the equal protection of the law to all
persons, but does not prohibit private action, the
Court for the first time held that judicial action
enforcing private discriminatory agreements is
State action and therefore within the 14th Amend-
ment's field of operation. The holding consequently
was that, although such restrictive covenants regard-
less of the race against whom they were directed
are not invalid or void (since they result from the
action of individuals), they were nevertheless unen-
forceable in the State courts for such enforcement
would be State action. The Supreme Court in *Shel-
ley v. Kraemer, supra* at p 13, put it thus:

" 'We conclude, therefore, that the restrictive
agreements standing alone cannot be regarded as
violative of any rights guaranteed to petitioners by
the 14th Amendment. So long as the purposes of
those agreements are effectuated by voluntary ad-
herence to their terms, it would appear clear that
there has been no action by the State and the provi-
sions of the amendment have not been violated.
* * * But here there was more. These are cases
in which the purposes of the agreements were se-
cured only by judicial enforcement by State courts
of the restrictive terms of the agreements. * * *
[Citing *In Ex parte Virginia,* 100 US 339, 347 (25
L ed 676, 679)—an 1880 case]. * * * "A State
acts by its legislative, its executive, or its judicial

authorities. It can act in no other way." * * *
We have no doubt that there has been State action
in these cases in the full and complete sense of the
phrase. The undisputed facts disclose that peti-
tioners were willing purchasers of properties upon
which they desired to establish homes. The owners
of the properties were willing sellers; and contracts
of sale were accordingly consummated. It is clear
that but for the active intervention of the State
courts, supported by the full panoply of State power,
petitioners would have been free to occupy the prop-
erties in question without restraint. * * * These
are cases in which the States have made available
to such individuals [those desiring to impose the
restrictive covenants] the full coercive power of gov-
ernment to deny to petitioners, on the grounds of
race or color, the enjoyment of property rights in
premises which petitioners are willing and finan-
cially able to acquire and which the grantors are
willing to sell. The difference between judicial en-
forcement and nonenforcement of the restrictive
covenants is the difference to petitioners between be-
ing denied rights of property available to other
members of the community and being accorded full
enjoyment of those rights on an equal footing. * * *
Judicial action is not immunized from the operation
of the 14th Amendment simply because it is taken
pursuant to the State's common-law policy. Nor is
the amendment ineffective simply because the partic-
ular pattern of discrimination, which the State has
enforced, was defined initially by the terms of a
private agreement. State action, as that phrase is
understood for the purposes of the 14th Amendment,
refers to exertions of State power in all forms. And
when the effect of that action is to deny rights sub-
ject to the protection of the 14th Amendment, it is
the obligation of this Court to enforce the constitu-
tional commands. * * * We hold that in granting
judicial enforcement of the restrictive agreements
in these cases, the States have denied petitioners the

equal protection of the laws and that, therefore, the action of the State courts cannot stand.'

"In answer to the contention that such restrictive covenants would not deny equal protection of the laws because such covenants could be used to restrict ownership, use or occupancy of whites, orientals, Indians, et cetera, as well as Negroes, the Supreme Court said [at p 22]:

"'The rights created by the first section of the 14th Amendment are, by its terms, guaranteed to the individual. The rights established are personal rights. It is, therefore, no answer to these petitioners to say that the courts may also be induced to deny white persons rights of ownership and occupancy on grounds of race or color. Equal protection of the laws is not achieved through indiscriminate imposition of inequalities.'

"The United States Supreme Court followed this case with *Barrows* v. *Jackson* (1953), 346 US 249 (73 S Ct 1031, 97 L ed 1586), holding that a State court's award of damages in an action for breach of a covenant restricting the use and occupancy of real property to persons of the Caucasian race was State action under the 14th Amendment and therefore prohibited. (*Shelley* v. *Kraemer, supra,* dealt with the validity of a State court's action enjoining the use and occupancy of the premises by members of the group which the restrictive covenant barred.)

"The Michigan Supreme Court reentered the picture with *Phillips* v. *Naff* (1952), 332 Mich 389, which held that an action for damages for breach of a reciprocal racial restriction in a suit against a person who sold to a Negro in violation of such restriction was an indirect action for enforcement of the restriction and, as such, was State action within the ruling of *Shelley* v. *Kraemer* and the companion case arising out of the District of Columbia, *Hurd* v. *Hodge* (1948), 334 US 24 (68 S Ct 847, 92 L ed 1187). The Michigan Supreme Court in a decision by Justice Carr in *Phillips* v. *Naff, supra,* expressly refused to follow *Weiss* v. *Leaon* (1949), 359 Mo 1054 (225

SW2d 127), which latter case drew a distinction in terms of State action and private action between injunctive relief to enforce such a restriction and a suit for damages for breach thereof. The Michigan Supreme Court said in *Phillips* v. *Naff, supra,* at p 401:

" 'We are not in accord with such decision. As above suggested, if a sale of property subject to a reciprocal racial covenant cannot be made without rendering the grantor liable to suits for damages, such fact, it may be assumed, would operate to inhibit freedom of purchase by those against whom the discrimination is directed, and also to place a burden on the right of an owner to sell to a purchaser of his own selection. We think the reasons on which the decision of the United States Supreme Court in *Shelley* v. *Kraemer* was based operate in bar of an indirect method of enforcement, and are sufficiently broad in scope as to cover the rights of those affected in the instant controversy.'

"The foregoing appears to answer the defendant's argument that permitting the defendant to assert the covenant in defense of a suit by the plaintiff was not enforcement of the restrictive covenant by the State. This writer can conceive of no significant difference between the restrictive covenant being used as a basis for an action for either damages or an injunction by the proponent of such covenant and its assertion as a defense. If such covenant is recognized by a State court either as an offensive or a defensive legal weapon, it is supported in either case by all the coercive power of government and is equally an enforcement of the covenant such as would be barred by *Shelley* v. *Kraemer, supra.* Support for this view need not rest solely on the cases already cited, but may be found in *Clifton* v. *Puente* (1948, Tex Civ App), 218 SW2d 272. In that case the defendant obtained possession of the premises prior to the time the Mexican purchaser was able to obtain possession. When the purchaser sought a judgment for possession and was met with the

defense that his possession would violate a covenant prohibiting sale or lease to persons of Mexican descent, violation of which covenant would re-vest title in the violator's grantor, the Texas court held that the covenant may not be used as a defense to the action for title and possession of the realty. The court said at page 274 that:

" 'It is as much an enforcement of the covenant to deny to a person a legal right to which he would be entitled except for the covenant as it would be to expressly command by judicial order that the terms of the covenant be recognized and carried out. No valid distinction can be predicated upon the position of a party * * * as a plaintiff or as a defendant. Under the decision of the Supreme Court above referred to [*Shelley* v. *Kraemer*], judicial recognition or enforcement of the racial covenant involved here by a State court is precluded by the "equal protection of the laws" clause of the 14th Amendment.'

"And so the defendant's contention that there is nothing in the law which indicates a recognition of a defense to a suit by recognition of a racially restrictive covenant is erroneous. It is based upon the proverbial 'distinction without a difference' and falls within the 14th Amendment's ban upon State action.

"The law having been established as to restrictive covenants and the ban upon their enforceability by the State courts, is there any reason why such ban should not be applied to a cemetery lot, be it ownership thereof in fee simple, a mere right of burial or sepulture, a license, franchise or easement? The defendant asserts that burial rights are different and that such racially discriminatory clauses as are here involved are permissible. In support of this contention, defendant cites 14 CJS, Cemeteries, § 31, pp 90, 91, and 10 Am Jur, Cemeteries, § 30, pp 507, 508, both of which state that a cemetery corporation may validly pass a regulation stating that the remains of persons of the white race only may be

admitted to burial.   *   *   *   In response to such
assertion, it need only be pointed out that both
quotations are out of date, the quotation from Amer-
ican Jurisprudence having been written in 1937, and
that from Corpus Juris Secundum in 1939, 11 and
9 years respectively before *Shelley.*   The supple-
ments to these works do not refer to *Shelley* nor is
any editorial comment changed or added.   In short,
such out of date encyclopedic authority cannot be
relied upon.   The same applies to the case authority
cited by defendant, specifically *People, ex rel. Gas-
kill,* v. *Forest Home Cemetery* (1913), 258 Ill 36 (101
NE 219) ; *Forest Lawn Memorial Park Association*
v. *De Jarnette* (1926), 79 Cal App 601 (250 P 581) ;
*Booker* v. *Grand Rapids Medical College* (1909),
156 Mich 95 (24 LRA NS 947) ; *State, ex rel. Clark,*
v. *Maryland Institute* (1898), 87 Md 643 (41 A 126).

"Both plaintiff and defendant cite *Rice* v. *Sioux
City Memorial Park Cemetery* (1953), 245 Iowa 147
(60 NW2d 110, 348 US 880 (75 S Ct 122, 99 L ed
693) (United States Supreme Court affirmed Iowa
court by an equally divided court without opinion
on November 15, 1954) ; 349 US 70 (75 S Ct 614, 99
L ed 897).   (United States Supreme Court on re-
hearing of the prior affirmance and withdrawal
thereof and dismissal of the writ of certiorari.)
This case involved a cemetery with the same type
of restriction as that in the instant case, but instead
of a Negro, it involved a person of 11/16 Winnebago
Indian blood and 5/16 white blood.   The deceased
was Sgt. John Rice who was killed in active combat
duty in Korea.   Burial was refused because he was
not a Caucasian and an action was brought by the
widow against the cemetery for damages for the
cemetery's refusal to permit the burial in a lot pur-
chased by the widow.   In the Iowa court's analysis,
there was no question but that there was no dis-
tinction drawn between *Shelley* v. *Kraemer, supra,*
and the *Rice Case* upon the grounds that the former
dealt with real estate in the traditional sense and
the latter with a cemetery lot or right of burial.

The Iowa court held that such indirect 'support of private agreements containing restrictive covenants' as that which would permit the plaintiff to recover damages against the cemetery was an unwarranted extension of the doctrine of *Shelley* v. *Kraemer*. Further, the Iowa court had in mind the preservation of 'desirable individual rights of restriction in church and fraternal private burial places.'

"This case cannot be considered as authority for the defendant's view in the instant case for three reasons:

"First: The Iowa court somehow throws into the balance scale of justice a fact not in existence in the instant case, to wit: The place of church and fraternal private burial places. More will be said on this subject shortly;

"Second: The United States Supreme Court granted certiorari and affirmed by an equally divided court; upon rehearing, the affirmance was vacated and the writ of certiorari was dismissed as having been improvidently granted. It is too basic to require a citation of authority that the denial of a writ of certiorari in the United States Supreme Court is not authority for anything except that the Court has exercised its discretion to refuse to hear and decide the case on the merits. See the opinion on the rehearing for a discussion of the reasons for dismissing the writ of certiorari;

"Third: The *Rice Case* is not authority in the instant case because the State of Michigan is committed to the doctrine that indirect enforcement of such covenants is equally prohibited under *Shelley* v. *Kraemer, supra,* as direct enforcement. See *Phillips* v. *Naff, supra.*

"Should the fact that the property involved is a cemetery lot require a conclusion different from *Shelley?* We have seen that on the basis of a difference in the nature of the property interest, there was no distinction drawn even in *Rice* and the 're-strictive covenant—State action' analysis was applied by the Court in reaching its decision. But,

going further, this question should be asked: Is the
private covenant any less restrictive because it deals
with a cemetery lot or with personal property? The
answer appears obvious—No. Is the enforcement by
State courts of such private covenants as to a ceme-
tery lot any less State action than if the covenant
dealt with real property? Again the answer should
be obvious—No.

"As pointed out by the defendant, the interest
of the plaintiff herein is a burial right or right of
sepulture. There is no question but that such burial
right is a peculiar interest incapable of being pushed
into the convenient pigeonhole lawyers and judges
are so wont to place difficult concepts. It is not a
fee interest, but rather a right of burial which is
transferable and the rights of holders thereof are
legally enforceable. *Rowley* v. *Laingsburg Ceme-
tery Association* (1921), 215 Mich 673; *Wetherby* v.
*City of Jackson* (1933), 264 Mich 146; *Wells* v.
*Daniell* (1934), 266 Mich 250; *Richmond Hills Memo-
rial Park Association* v. *Richardson* (1936), 275 Mich
403; *Huse* v. *East China Township Board* (1951),
330 Mich 465; *Harvey* v. *Lewis* (1959), 357 Mich 305.
Regardless of what label we hang on this interest,
it is a property right.

"'Whether the purchaser of a burial space ac-
quires a special kind of estate in fee subject to
various conditions, regulations and restrictions cou-
pled with the use of common cemetery facilities or a
kind of perpetual easement coupled with an inter-
est in the entire cemetery, or whether the property
is a special kind of perpetual license or privilege,
the fact remains that it is, nevertheless, an "interest
in real estate" within the purview of the statute.
Our statutes treat ownership of an interest in a
cemetery lot as an interest in real estate. They
provide for transfer of the interest by sale or inheri-
tance   *   *   *   and provide that actions by a public
cemetery association to quiet title to cemetery lots
may proceed in the same manner as actions to deter-
mine title to real estate.   *   *   *   *Even though a pur-

*chaser of a cemetery lot may not acquire the fee
simple title to the property, he has a right in the lot
which the law recognizes and protects.'* (Emphasis
supplied.) *Erickson v. Sunset Memorial Park Asso-
ciation* (1961), 259 Minn 532 (108 NW2d 434).

"It appears therefore clear that the 'restrictive
covenant—State action—14th Amendment' approach
applies to cemetery lots to the same extent that
such analysis applies to more conventional property
interest. See *Erickson, supra.*

"In reaching the conclusion that such restrictive
covenants as are here involved are unenforceable,
this writer would make it absolutely clear that such
conclusion in no way prevents cemeteries maintained
by a particular religious faith from restricting burial
rights to members of that faith. That is not the
case with the defendant cemetery in this cause. De-
fendant was organized under PA 1869, No 12, as
amended, CL 1948, § 456.101 (Stat Ann 1963 Rev
§ 21.871) which act is entitled:

" 'An act to authorize and encourage the formation
of corporations to establish rural cemeteries, and
to provide for the care and maintenance thereof, and
to provide for the revision and codification of the
laws relating to cemeteries, mausoleums, crypts,
vaults, crematoriums, and other means of disposing
of the dead, and to make an appropriation therefor.'

"There is no religious or fraternal aspect to the
operation of the defendant either by any applicable
statute or in its articles of incorporation or in the
manner in which it is operated.

"The language of the Minnesota court in *Erickson,
supra,* at p 542 is equally appropriate to the defend-
ant, Flint Memorial Park. Justice Murphy said:

" 'The public nature and character of its business
and interests, as reflected by the provisions of chap
306, by virtue of which the State permits it to oper-
ate, should be distinguished from the private char-
acter of cemeteries operated by religious and fra-
ternal corporations under chap 307 and cemeteries

within the purview of the last sentence of section 306.02, which recognizes the right of a public cemetery association affiliated with a religious corporation to acquire properties to be used exclusively for burial of persons of that particular faith. From time immemorial cemeteries and interment in them have had a close identification with religion. This identification is natural to religion in civilized cultures. An essential element of many religious beliefs, strongly held for centuries, has been that their communicants must be buried in consecrated ground in which only communicants of that particular faith may be buried. The right of burial in a religious or fraternal cemetery derives from membership. It is for that reason that church cemeteries are classified as private cemeteries in which the exclusive burial of communicants of a religious faith may be practiced in accordance with its beliefs.'

"In this regard sales of lots in defendant's cemetery are not restricted by virtue of any required membership in any religious, fraternal or other type of special organization, but are for sale to the general public without qualification except as to the restrictive covenant with which this opinion deals.

"And finally, defendant asserts that 'there is nothing to prevent the plaintiff from choosing a place of burial among his own kind.' In this connection please note the language of the Supreme Court previously quoted on page 164 of this opinion indicating that the rights under the 14th Amendment are personal rights that are not attached to white persons or to Negroes or to Indians, et cetera, but to individuals. I repeat:

" 'Equal protection of the law is not achieved through the indiscriminate imposition of inequality.'

"How valid and significant is defendant's statement that plaintiff could 'seek burial among his own kind'? Does the defendant assume that plaintiff's own kind is restricted to skin pigmentation? May

not the plaintiff select the burial place of his loved ones on the basis of location, price, esthetic appreciation or whatever personal factors an *individual* may want to use to select a burial plot? It is a bizarre interpretation of the equal protection of the laws clause of the 14th Amendment to conclude that this protection is to afford a white person what all white people would want—burial among whites; and to the Negro a burial 'among his own kind.' The law of this land looks to enforcement of the rights of individuals without presuming to force upon the individual what we imagine such individuals want and without assuming that there is recognized in the law a social, economic, racial, religious or political caste system with a different set of rights and desires for all members of each group. When the law recognizes the philosophy represented by 'his own kind,' we are only a step away from adopting the racist philosophy which World War II was fought to eliminate.

"This opinion must close and this writer can think of no better way than to quote the language of Mr. Justice Dooling in *Long* v. *Mountain View Cemetery Association* (1955), 130 Cal App 2d 328, 330 (278 P2d 945, 946); also quoted at page 535 of *Erickson*:

" 'I cannot believe that a man's mortal remains will disintegrate any less peaceably because of the close proximity of the body of a member of another race, and in that inevitable disintegration I am sure that the pigmentation of the skin cannot long endure. It strikes me that the carrying of racial discrimination into the burial grounds is a particularly stupid form of human arrogance and intolerance. If life does not do so, the universal fellowship of death should teach humility. The good people who insist on the racial segregation of what is mortal in man may be shocked to learn when their own lives end that God has reserved no racially exclusive position for them in the hereafter.'

"JUDGMENT FOR THE PLAINTIFF and an appropriate judgment order shall be tendered by plaintiff's counsel forthwith for signature."

Judgment for plaintiff affirmed. Costs to appellee.

T. G. KAVANAGH and QUINN, JJ., concurred.